Wade Earl STEWART and Tommy MCGHEE *v.* STATE of Arkansas

CR 74-121                                   519 S.W. 2d 733

Opinion delivered March 3, 1975
[Rehearing denied March 17, 1975.]

754

*Harold L. Hall,* Public Defender, for appellants.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Dep. Atty. Gen.; *Lee A. Munson,* Pros. Atty., by: *John Wesley Hall Jr.,* Dep. Pros. Atty., for appellee.

FRANK HOLT, Justice. Appellants were charged by information with murder in perpetration of an attempt to commit robbery. Ark. Stat. Ann. § 41-2205 (Repl. 1964). The jury found them guilty of murder in the first degree and assessed their punishment at life imprisonment in the Department of Correction. Appellants first assert for reversal that the evidence is insufficient because there is no substantial evidence from which the jury could find that murder resulted from an attempt to perpetrate robbery. Upon appellate review, it is firmly established that we consider that evidence which is most favorable to the appellee, with all reasonable inferences deducible therefrom, and affirm if any substantial evidence exists to support the jury verdict. *Miller* v. *State,* 253 Ark. 1060, 490 S.W.2d 445 (1973).

A witness for the state, Bullock, testified that he met the appellants at a party. Later that evening, he, appellants, and others went to the victim's apartment "[T]o take some dope" and we would get it with a gun "[I]f it was necessary." Appellant McGhee was armed with a .38 caliber pistol and appellant Stewart carried a sawed-off shotgun. The state's witness testified that he saw McGhee pull his pistol on the victim who then put his hands up. Thereupon, Stewart was observed jumping over a porch railing and the shotgun he was carrying discharged. The witness then heard several small caliber shots. Another witness for the state, who was living with the victim, testified that she heard "a loud shot and then three other shots." The victim fled to their apartment where she observed him "covered with blood." He spontaneously told her "that as soon as he [the victim] opened the door this one kid was standing there and flashed this money in his face for some reason, and then this other one, this little one, jumped onto the porch with a shotgun and shot him and he turned to run up the stairs and then the other one shot him three times with the pistol."

Appellants Stewart and McGhee made separate written statements which were read to the jury subsequent to Bullock's testimony. Neither testified. Stewart admitted in his statement that he was armed with a shotgun and accompanied his codefendant, McGhee, and others in furtherance of the plan to rob the victim. McGhee admitted in his statement that he accompanied his codefendant, Stewart, and others to the victim's apartment and that he, McGhee, was armed with a .38 caliber pistol. As soon as the victim opened the door, he, McGhee told him he wanted to buy some dope and that "Danny" had sent him. During the discussion, one of the group said "if he won't sell it to us we'll just take it." A blast from a shotgun followed and thereupon "he [McGhee] grabbed the pistol from my rear pocket and struck Lenoris [a companion] in the face, so he wouldn't shoot. As I slapped at Lenoris, the pistol did go off, but I'm not sure when it struck."

Certainly the state adduced ample substantial evidence that would justify the jury in finding the appellants committed murder in an attempt to perpetrate robbery. They

went heavily armed to the victim's residence where they confronted him at the door. When the victim "throwed his hands up," he was wounded by a shotgun blast into the right side of his chest and wounded in other areas of his body from two pistol shots. The "transaction had gone beyond intent and preparation and had passed into acts which amounted to an attempt at robbery." *Turnage* v. *State*, 182 Ark. 74, 30 S.W.2d 865 (1930).

Appellants next contend that the court erred in admitting evidence of an autopsy not performed by the state medical examiner or one of his authorized assistants in violation of the defendants' state and federal constitutional rights. Ark. Stat. Ann. § 42-611, *et seq*, establishes the office of state medical examiner and prescribes the duties and the stringent qualification required of that individual. The present medical examiner meets the statutory requirement and is a forensic pathologist based upon specialized training. § 42-623 provides that records and reports made under authority of the act "shall be received as competent evidence . . . . upon being properly attested." § 42-615 requires that the state medical examiner be notified whenever a person dies from violence or under unusual circumstances. Appellants assert that the purpose of this statute is to give the state medical examiner, a medico-legal expert, the exclusive authority, here, to conduct the postmortem examination. Therefore, an autopsy performed without this authority is inadmissible evidence.

We do not construe the statute to absolutely prohibit another doctor, who is competent to do so, from performing an autopsy and then testifying. The purpose of the act, and properly so, was to create a scientific and uniform method of investigating violent and unusual deaths. In *State* v. *Ruggiero,* 93 R.I. 241, 174 A.2d 555 (1961), the proper statutory procedure was not followed and the court said:

> These contentions lack merit. A careful reading of Chap. 23-4 shows clearly that it does not apply to matters affecting the admissibility of evidence. It has no bearing on the question of the admissibility of the testimony of a medical expert who is otherwise qualified

to perform an autopsy, or on the admissibility of the autopsy report prepared by such medical expert.

In the case at bar, the victim was taken to a local hospital suffering from a shotgun blast to the right chest and pistol wounds to the wrist and knee. Following removal of the right lung by his personal physician, the victim was placed in intensive care. Five days later additional surgery was required to remove several ribs to curtail infection. Five days later while still in intensive care, the victim suddenly died. Without notifying the state medical examiner, the victim was partially embalmed and then an autopsy was performed by an anatomical pathologist at the hospital in the regular course of his duties there. His training does not meet the strict statutory standard required of a state medical examiner. However, he has performed over 300 autopsies in addition to testifying in court. This pathologist testified that the victim died from a blood clot in the pulmonary artery and that the blood clot resulted from either the surgery or the gunshot wound which required the surgery. Needle marks were found in the victim's legs which appellants assert indicate he was a drug user. The doctor testified that an improper injection of drugs could have caused death and the embalming procedure could have nullified the presence of drugs. Regardless, we perceive no prejudice to the appellants based upon this pathologist's testimony. Furthermore, it was cumulative to the testimony of the victim's attending physician, who observed the victim each day. He testified:

Q. What in your opinion, was the cause of death of Nicholas Papadoplas?

A. Nicholas Papadoplas died of a pulmonary embolism, which is secondary to the gunshot wound of the chest.

The surgeon who operates on and attends the victim may give an opinion as to the cause of death without reference to an autopsy. McClendon v. State, 197 Ark. 1135, 126 S.W.2d 928 (1939).

From what we have previously indicated, suffice it to say that the court did not err in refusing appellants' requested instruction for a directed verdict of acquittal; their requested

instruction that "where substantial evidence alone is relied upon to establish the cause of death . . . .;" and their requested instruction that the sheriff and the state medical examiner must be notified in the circumstances here.

Appellants assert that the court erred in admitting into evidence the cross-implicating confessions of appellants. Each confession was read to the jury with only the codefendant's name deleted and replaced by a blank line. As previously indicated, neither of the appellants testified. Appellants assert that a cross-implicating confession by a nontestifying codefendant, as here, denied them their constitutional right to be confronted by that witness and, therefore, was in violation of *Bruton* v. *United States*, 391 U.S. 123 (1968). We cannot agree with appellants that *Bruton* or our own subsequent cases dictate a reversal in the case at bar. In *Bruton*, the cross-implicating confession of a codefendant who did not testify, was admitted into evidence against Bruton, who had made no admissions or confession. Neither did he testify. There it was held that this denied Bruton his constitutional right to be confronted by the witness against him. Thereafter, in *Mosby and Williamson* v. *State*, 246 Ark. 963, 440 S.W.2d 230 (1969), we reversed the trial court because it gave an instruction, unrequested by the defendant, stating that his failure to testify could not be considered as evidence of guilt. However, in view of a retrial, we deemed it necessary to observe, since cross-implicating confessions were permitted there, that:

> The answer to the problem [in *Bruton*] seems to be to delete any offending portions of the admissions with reference to a codefendant, if such deletion is feasible and can be done without prejudice, or to grant separate trials.

The progeny of that case is *Miller* v. *State*, 250 Ark. 199, 464 S.W.2d 594 (1971); *Byrd* v. *State*, 251 Ark. 149, 471 S.W.2d 350 (1971); *Grooms* v. *State*, 251 Ark. 374, 472 S.W.2d 724 (1971); and *Patrick* v. *State*, 255 Ark. 10, 498 S.W.2d 337 (1973). In the case at bar, as indicated, the codefendant's name in each cross-implicating confession was deleted and replaced by a blank line in an effort to comply with our decisions.

There were numerous other participants whose names were not deleted. The statement of one of the nontestifying appellants, Stewart, was that his shotgun discharged accidentally when he jumped off a porch rail and that _____, who had a pistol, started shooting at the victim. A statement of the other nontestifying appellant, McGhee, was that he had a pistol as did another named companion. Also when he "was talking to the pusher, _____ and Lenoris Ball came up on the side of the porch" and "both had sawed off shotguns." He denied shooting the victim and struck Ball to prevent him from using his shotgun. When he did so his, McGhee's, pistol went "off." Ball's gun was never fired. Consequently, each of the declarants admitted their presence and purpose at the scene of the crime, though contradicting each other in some aspects with respect to the extent of their complicity. Furthermore, Bullock, a participant and the state's witness, had previously testified that he saw McGhee at the door with a pistol on the victim and that he observed Stewart, who had a shotgun, jump "over a post, and the shotgun discharged" shooting the victim.

Since *Bruton* various U. S. Circuit Courts of Appeal and state courts have found *Bruton* inapplicable in factual situations somewhat similar to the case at bar on the premise that interlocking confessions, which are assertively corroborative of each other, as here, are not violative of *Bruton* when admitted into evidence. The first case in which the rule as to interlocking confessions was expounded is *U. S. ex rel, Catanzaro* v. *Mancusi,* 404 F.2d 296 (2d Cir. 1968), cert. den. 397 U. S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123. There the court held that the admission into evidence of a confession of a codefendant, which interlocked with and was supported by Catanzaro's own confession, did not prejudice Catanzaro's right to a fair trial. The court said:

> Where the jury has heard not only a codefendant's confession but the defendant's own confession no such 'devastating' risk attends the lack of confrontation as was thought to be involved in *Bruton.*

This case was decided only six months after *Bruton.* Cf. *Harrington* v. *California,* 395 U.S. 250 (1969); and *Nelson* v.

*O'Neil*, 402 U.S. 622 (1971).

Then came *United States ex rel Duff* v. *Zelker*, 452 F.2d 1009 (2nd Cir. 1971), cert. den. 406 U.S. 932, 92 S.Ct. 1807, 3 L.Ed.2d 134, where the court again applied the rule on interlocking confessions. There the court said:

> We reject appellant's claim that the admission of the written statements of Ferguson and Hill violated the rule of *Bruton* v. *United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The statements were similar to Duff's own confessions, written and oral, which placed him at the scene with a fair implication of knowing participation. When the defendant's 'confession interlocks with and supports the confession of' the codefendant, there is no violation of the *Bruton* rule.

* * * * * *

> As far as Ferguson's statement is concerned, it should be noted also that Duff had the opportunity to cross-examine Ferguson at the Huntley hearing. [Denno hearing.] See *California* v. *Green*, 399 U.S. 149, 165, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *People* v. *Moll*, 26 N.Y.2d 1, 307 NYS 2d 876, 256 N.E.2d 185 (1970).

The rule was applied reluctantly by a different panel of the same court in *United States ex rel Ortiz* v. *Fritz*, 476 F.2d 37 (2nd Cir. 1973), cert. den. 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed. 2d 482. The court considered itself bound by the *Catanzaro* rule. The court resolved the question whether the confessions there were sufficiently interlocking because discrepancies in them were such as to make one or more erroneous or false, by saying that as to motive, plot and execution they were (as here) essentially the same. The court then said that it was uncomfortable with the implications of *Catanzaro*, but found it to be the law of the circuit, having been followed in two subsequent cases. The court then said:

> . . . . If it is to be overruled, it will have to be by the Supreme Court, absent the requisite en banc vote which — through prior circulation of this opinion — has not ensued.

In spite of the open invitation, certiorari was again denied. The court found *Catanzaro* expressive of the law in *United States* v. *DeBerry*, 487 F. 2d 448 (2d. Cir. 1973). To the same effect are *United States ex rel Long* v. *Pate*, 418 F. 2d 1028 (7th Cir. 1969); *Metropolis* v. *Turner*, 437 F. 2d 207 (10th Cir. 1971), where the *Harrington* harmless error rule and the *Cantanzaro* rule were both held applicable, and *United States* v. *Spinks*, 470 F. 2d 64 (7th Cir. 1972).

*Bruton* has been distinguished also in state courts on the difference between the situation here and the situation where a defendant who has remained silent at all times is inculpated by a codefendant's confession. *State* v. *Hall*, 185 Neb. 653, 178 N.W. 2d 268 (1970); *State* v. *Aiken*, 75 Wash. 2d 421, 452 P. 2d 232 (1969); *State* v. *Hopper*, 253 La. 439, 218 So. 2d 551 (1969); and *Commonwealth* v. *Scott*, 355 Mass. 471, 245 N.E. 2d 415 (1968).

In the case at bar, each defendant has, by his own statement, implicated himself in active participation in a robbery which resulted in the killing of the victim. Each participant is equally as guilty under these circumstances as is the other. *Turnage* v. *State*, 182 Ark. 74, 30 S.W. 2d 865 (1930). Ark. Stat. Ann. § 41-118 (Repl. 1964). Stewart said he wanted to go along on the robbery of the dope pusher, went up to the house, cocked his shotgun and climbed upon the porch rail. The fact that he claimed that his shotgun went off accidentally made him no less guilty of the crime with which he was charged, particularly when this happened because he jumped off the porch rail thinking that his *unnamed* confederate, who was talking to the "dude", was waiting on Stewart to "make his move."

McGhee's statement was that he had a .38 pistol in his hip pocket when he went to the "pusher's" door and that two others had sawed off shotguns. One of them, Lenoris, said "if he won't sell it to us, we'll just take it." About this time, said McGhee, the pusher opened the screen door and an *unnamed* companion's shotgun went off as he jumped off the wooden rail. McGhee admitted that the pistol he had went off and that when he was back in the car in which he came to the scene, three shells had been fired. Also each statement is corroborative of the testimony of their accomplice, Bullock.

We did not actually hold in *Mosby and Williamson* v. *State, supra,* that *Bruton* required reversal of their convictions. Our reversal was predicated upon an erroneous instruction. We did little more than the Massachusetts Supreme Judicial Court did in *Commonwealth* v. *Scott, supra,* i.e., alert the courts and prosecutors to the risks inherent in the introduction of confessions of individual defendants in the joint trial of multiple defendants. We merely called attention to *Bruton* and the case of *Roberts* v. *Russell,* 392 U.S. 293 (1972). In addition, we pointed out that a separate trial was mandatory in a capital case, as Mosby was, so that the "problem" of cross-implicating confessions would not arise if a separate trial were requested. See *Sims* v. *State,* 253 Ark. 1119, 491 S.W. 2d 583 (1973). Furthermore, the only evidence other than the confessions in the *Mosby* case was the fact that the crime had been committed. In *Miller* v. *State,* supra, we simply held that no problem of confrontation contrary to *Bruton* arose when the trial court struck all portions of confessions of codefendants relating to other defendants. In *Byrd* v. *State, supra,* we did say that we had held, in *Mosby,* that it was prejudicial error to admit cross-implicating confessions in a joint trial, again suggesting that an answer to the problem would be deletion of offending portions referring to a codefendant, if feasible. However, we emphasized the fact that the appellant testified and denied any complicity in the alleged crime. So the case now before us is readily distinguishable from *Byrd.*

In *Grooms* v. *State,* 251 Ark. 374, 472 S.W. 2d 724 (1971), there was no confession by the appellant in whose trial the confession of a codefendant implicating appellant was narrated without any apparent deletion. In *Patrick* v. *State, supra,* the cross-implicating confessions of all three codefendants were introduced "in toto." There is nothing to indicate what other evidence was offered to show their complicity in the burglary and grand larceny with which they were charged.

In short, in our post-*Burton* cases, we have not foreclosed the treatment of cross-implicating confessions as approved in *Catanzaro* and kindred cases. Significantly, it has not been foreclosed by the U.S. Supreme Court in spite of an undisguised plea for it to do so by the court in which it was first

ennunciated. *United States, ex rel Ortiz* v. *Fritz, supra.* This is the first time that our state has urged its applicability.

In the case at bar, appellants' motives, plots and participation in the crime are essentially the same. Unlike *Bruton,* both appellants made interlocking and corroborative confessions, the voluntariness of which is not in issue. As codefendants, their names were deleted. It does not appear that a severance was requested. Also their confessions are corroborative of one of their accomplices, who was subjected to a lengthy cross-examination. It does not appear in the factual situation here that harm is being done to individual rights by holding, as we do, that *Bruton* is inapplicable.

Affirmed.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting. It sounds logical to tell the jury that they should not consider the confession of one codefendant against another jointly tried codefendant, but the logic becomes absurd when on appeal we compare one with another to determine if there was any prejudicial error in admitting the confessions. If we do what we tell the jury not to do, then I can find no practical reason why the jury ought to disregard the confession of one defendant when considering the guilt or innocence of the other.

The Constitution prohibits the conviction of an individual without confronting him with the witnesses against him. When the confession of the codefendant is introduced through an officer, the other codefendant has no right to cross-examine the codefendant as to the truth and veracity of the facts therein recited.

Like Justice Marshall in his dissent in *Nelson* v. *O'Neil,* 402 U.S. 622, 635, 91 S. Ct. 1723, 1729, 29 L. ed. 2d 222 (1971), I think we should follow the procedure suggested by The American Bar Association's Project on Standards for Criminal Justice. He there stated:

"The American Bar Association's Project on Stan-

dards for Criminal Justice, Advisory Committee on the Criminal Trial, suggested that if a defendant in a joint trial moves for a severance because the prosecutor intends to introduce an out-of-court statement by his codefendant that is inadmissible against the moving defendant, then the trial court should require the prosecutor to elect between a joint trial in which the statement is excluded; a joint trial at which the statement is admitted but the portion that refers to the moving defendant is effectively deleted; and severance. I believe that the adoption of such a practice is the only way in which the recurring problems of confrontation and equal protection can be eliminated."